IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| | Case No. 13-11761 (BLS) |
| **AgFeed USA, LLC, et al,**[1] | |
| | Jointly Administered |
| Debtors. | |
| **JLL CONSULTANTS, INC., AS TRUSTEE OF THE AGFEED LIQUIDATING TRUST** | Adv. No. 15-50210 (BLS) |
| Plaintiff, | |
| v. | |
| **K. IVAN F. GOTHNER,** | |
| Defendant. | |

---

[1] The Debtors and the last four digits of their federal tax identification numbers are: AgFeed USA, LLC (8748), AgFeed Industries, Inc. (7168); TS Finishing, LLC (8748); New York Finishing, LLC (8748); Pork Technologies, LC (2076); New Colony Farms, LLC (9246); Heritage Farms, LLC (8141); Heritage Land, LLC (8129); Genetics Operating, LLC (1921); M2P2 Facilities, LLC (8748); MGM, LLC (8748); M2P2 General Operations, LLC (8748); New Colony Land Company, LLC (5834); M2P2 AF JV, LLC (8748); Midwest Finishing, LLC (8748); and Genetic Land, LLC (1921).

ELLIOTT GREENLEAF
Eric M. Sutty
Rafael X. Zahralddin-Aravena
1105 North Market Street
Suite 1700
Wilmington, DE 19801

--and—

SUGAR FELSENTHAL
GRAIS & HAMMER LLP
Aaron L. Hammer
Mark Melickian
Leland H. Chait
30 N. LaSalle St., Ste. 3000
Chicago, IL 60602

*Counsel to JLL Consultants,
Inc., as Liquidating Trustee of
the AgFeed Liquidating Trust*

ASHBY & GEDDES, P.A.
William P. Bowden
Andrew D. Cordo
Stacy L. Newman
F. Troupe Mickler IV
500 Delaware Avenue, 8th
Floor
Wilmington, DE 19801

*Counsel for Defendant K.
Ivan F. Gothner*

# OPINION

Before the Court is Defendant K. Ivan F. Gothner's ("Gothner")

Motion to Dismiss the Complaint (the "Motion") [Adv. Docket No. 7]

filed by JLL Consultants, Inc. ("JLL") as trustee for the AgFeed

Liquidating Trust. JLL initiated this adversary proceeding against

Gothner alleging that Gothner's conduct during his time as a director,

Chair of the Audit Committee, Vice-Chairman and Chairman of the

Board of AgFeed Industries, Inc. ("AgFeed"), constituted (i) a breach of

fiduciary duty; (ii) gross mismanagement; (iii) an abuse of control; (iv) a

waste of corporate assets; (v) an unjust enrichment; (vi) a breach of

contract; and (vii) fraudulent transfers. By the Motion, Gothner has

moved to dismiss the complaint pursuant to Rule 12(b)(6) of the

Federal Rules of Civil Procedure, made applicable to adversary

proceedings by Federal Rule of Bankruptcy Procedure 7012. For the

following reasons, the Court will grant the Motion in part, and deny the

Motion in part.

## I. JURISDICTION AND VENUE

The Court has jurisdiction over these matters pursuant to 28

U.S.C. §§ 1334 and 157(a) and (b)(1). Venue is proper in this Court

pursuant to 28 U.S.C. § 1409. The Court has the power to enter an

order on this Motion to dismiss even if the matter is non-core or it has

no authority to enter a final order. See, e.g., In re Nat'l Serv. Indus.,

Inc., No. AP 14-50377 (MFW), 2015 WL 3827003, at *2 (Bankr. D. Del.

June 19, 2015) ("Even if the matter is non-core or the Court lacks

authority to enter a final order, however, the Court has the power to

enter an order on a motion to dismiss.") (citations omitted); In re

Tropicana Entm't, LLC, 520 B.R. 455, 463 (Bankr. D. Del. 2014).

## II. BACKGROUND

On July 15, 2013 (the "Petition Date"), Agfeed USA, LLC and

fifteen of its affiliates (the "Debtors") filed for relief under chapter 11 of

the Bankruptcy Code.  The bankruptcy filing was the result of fraud

and an SEC investigation, which is discussed in more detail below.

Following a successful sale process, the Debtors' Revised Second

Amended Chapter 11 Plan (the "Plan") was confirmed on November 4,

2014.  The Plan provided for prompt payment in full of all priority,

administrative and general unsecured claims.  Upon the effective date,

the Liquidating Trust was created for the purpose of pursuing claims

and causes of action, litigating contested claims and interests and

ultimately making final distributions to holders of equity interests in

the Debtors.  JLL was appointed to serve as Liquidating Trustee (the

"Trustee").  On February 23, 2015, the Trustee commenced this

adversary proceeding alleging the following twelve causes of action against Gothner:  (I) Breach of Fiduciary Duty (Duty of Care); (II) Breach of Fiduciary Duty (Duty of Loyalty); (III) Gross Mismanagement; (IV) Abuse of Control; (V) Waste of Corporate Assets; (VI) Unjust Enrichment; (VII) Breach of Contract; (VIII) Fraudulent Transfer (11 U.S.C. § 548); (IX) Fraudulent Transfer (11 U.S.C. § 548); (X) Fraudulent Transfer (Applicable State Law and 11 U.S.C. § 544); (XI) Recovery of Avoidable Transfers (11 U.S.C. § 550; and (XII) Disallowance of Claims ( 11 U.S.C. § 502(d)).  On August 11, 2015, Gothner filed the Motion requesting dismissal of the complaint in its entirety for failure to state a claim pursuant to FRCP 12(b)(6).

Company History

Prior to its bankruptcy filing, AgFeed was engaged in the animal-nutrition and commercial hog production business through operating subsidiaries in China and, later, the United States.  In the early years AgFeed's operations and management were primarily based in China.  AgFeed went public on October 31, 2006 through a reverse merger with Wallace Mountain Resources Corporation, a Nevada corporation that was listed and trading on the OTC Bulletin Board.

Through a series of issuances of stock and warrants, between
December 28, 2007 and June 30, 2009, AgFeed raised approximately $95
million in capital.  AgFeed reportedly used the proceeds to expand
existing operations and acquire 29 hog producing farms in China for an
aggregate purchase price of $64.1 million.  During this period, AgFeed
operated solely in China and its Board of Directors and officers
consisted of a mix of Chinese nationals and two American directors,
Frederic Rittereiser ("Rittereiser") and Arnold Staloff ("Staloff").
During this time, Staloff was chair of the Company's Audit committee
and Rittereiser was a member of the committee.  The Audit Committee
was responsible for discharging the Board's responsibilities for
monitoring the quality, reliability and integrity of AgFeed's accounting
policies and financial statements, and overseeing the Company's
compliance with legal and regulatory requirements.

Throughout this time, unbeknownst to the company's public
shareholders, the company was engaged in a massive fraud that
centered on false financial reporting to the Securities and Exchange
Commission (the "SEC") and its shareholders.  Among other things, the
fraud included reporting company ownership of tens of millions of
dollars of fictitious assets, reporting of false profits arising from these
fictitious assets, reporting of fictitious or overstated accounts

6

receivable, overstatement of the company's earnings, and manipulation of its reported goodwill.

### Early Indications of Accounting Issues in China

Around August of 2009, Chief Operating Officer Gerald Daignault ("Daignault") realized that AgFeed was facing increasingly large accounts receivable and collectability issues in China. On August 10, 2009, Daignault reported to Rittereiser by email that AgFeed's accounts receivable totaled $14.6 million, and that AgFeed had "inconsistent and chaotic" internal financial controls. In September 2009, Ahmed Mohidin, the principal of AgFeed's external auditor, informally suggested to Staloff, the Chair of the Audit Committee, that AgFeed should begin reserving its aging accounts receivable at much higher levels than its current practice. On October 22, 2009, the Audit Committee reserved any decision to toughen AgFeed's reporting standards related to accounts receivable pending additional investigations.

### Gothner Joins AgFeed's Board

On December 14, 2009, Gothner joined AgFeed's Board, replacing Rittereiser on the Board. However, Rittereiser remained involved with the Board as an advisor. Immediately after joining AgFeed's Board, Gothner replaced Staloff as Chairman of the Audit

Committee, and Gothner was also named chair of the firm's Compensation and Nominating committees.

Gothner joined the Board and the Audit and Compensation and Nominating Committees as part of AgFeed's efforts to shift its management to the United States and improve internal controls. On March 8, 2010, AgFeed filed its 2009 Form 10-K (the "2009 10-K") with the Securities and Exchange Commission (the "SEC"). The 2009 10-K was signed by AgFeed's directors, including Gothner, as well as AgFeed's CEO and CFO. The complaint does not allege that Gothner had any role in the preparation of the 2009 10-K.

### Changes to AgFeed's Management and Advisors

Over the next year, AgFeed shifted its focus from China to become a global company with significant operations in the United States and with American leadership at its helm. On November 16, 2010, AgFeed announced that it had retained the accounting firm McGladrey & Pullen, LLP as its new independent public auditors, replacing Goldman Parks Mohidin LLP. AgFeed simultaneously announced that it had replaced its CFO, naming Edward Pazdro as its new CFO.

In February 2011, Dr. Songyan Li, Chairman of the Board of Directors, and Junhong Xiong, President and Chief Executive Officer,

were both replaced by John Stadler.  In late February 2011, at the
recommendation of the nominating committee headed by Gothner,
AgFeed added an additional U.S. independent director, Milton P.
Webster, III.

### Disclosure and Investigation of Potential Fraud

In early 2011, Pazdro began receiving preliminary reports of
accounting irregularities concerning operations in China.  Pazdro
shared these reports with Gothner.  On March 16, 2011 AgFeed filed its
2010 Form 10-K with the SEC (the "2010 10-K").  The 2010 10-K was
signed by the directors, including Gothner, as well as the CEO and
CFO.  The 2010 10-K disclosed that AgFeed's new auditors had
discovered certain deficiencies in the Company's "internal control[s]"
related to accounting.  Specifically, the 10-K disclosed that prior
management had "failed to identify all necessary GAAP adjustments."
The 2010 10-K also disclosed that AgFeed management implemented
remedial measures to address these deficiencies.  On March 25, 2011,
AgFeed disclosed that its financial reports between June 2009 and June
2010 should not be relied on and would have to be restated.  The
complaint does not allege that Gothner had any role in the preparation
of the 2010 10-K.

In early May of 2011, Daignault informed Gothner and Pazdro that he had discovered that the China managers had been keeping two sets of books, an internal book and an external (false) book. The external (false) book was used as the basis for all of AgFeed's financial reports. As a result, Gothner directed certain senior management, including Daignault (COO) and Pazdro (CFO), to investigate. In mid-June 2011, Gothner received a memorandum containing the results of the investigation. The report contained evidence of material accounting irregularities in AgFeed's China operations, but indicated that further investigation needed to be done in order to form definitive conclusions.

As investigation into the possible issues in China continued, on August 2, 2011, AgFeed held a stockholder meeting. On August 9, 2011, AgFeed filed its second quarter 2011 Form 10-Q (the "August 2011 10-Q") with an accompanying press release. The August 2011 10-Q was signed by AgFeed's then CEO and CFO, Stadler and Clayton T. Marshall, who had replaced Pazdro in mid-2011 as CFO. The complaint alleges that the August 2011 10-Q "contained no indication that [AgFeed] had, for all intents and purposes, confirmed that systematic fraud had occurred in China."

As part of the ongoing investigation, in late August 2011, AgFeed sent its new Chief Operating Officer, Glenn McClelland, to

China to investigate further.  McClelland submitted a report on September 6, 2011 (the "McClelland Report").  The McClelland Report indicated that additional follow up and investigation was necessary. Shortly after receiving the McClelland Report, the Board authorized the formation of a special committee (the "Special Committee") to investigate the extent of the issues in China.  The Special Committee was composed of two outside directors, Milton Webster ("Webster") and Bruce Ginn ("Ginn").

On January 2, 2012, Webster, as Chair of the Special Committee, issued a report to the Board.  On January 31, 2012 AgFeed filed an SEC form 8-K.  This document disclosed that the Special Committee had completed its investigation, and its findings had been presented to the Board.  The 8-K further disclosed that AgFeed's audited financial statements for the years ended December 31, 2008, 2009 and 2010 as well as the unaudited financial statements for the quarters ended June 30, 3010 and March 31 and June 30, 2011 should not be relied upon in light of the Special Committee's findings.  Finally, AgFeed noted its intent to file a Form 10-Q for the period ended September 30, 2011, as well as its intent to restate its financial statements for the periods affected by the accounting irregularities in the Chinese operations.

On December 20, 2011, Gothner was named Chairman of the Board and appointed interim CEO to replace Stadler who had stepped down. Gothner became AgFeed's permanent CEO on September 18, 2012, when he signed an employment agreement (the "Employment Agreement") with AgFeed.

Following an SEC investigation, on March 11, 2014, the SEC filed a complaint against AgFeed and several of its former officers and directors, including Gothner. The SEC complaint against Gothner is pending in the United States District Court for the Middle District of Tennessee.

<u>Self-Interested Transactions</u>

The complaint alleges that between April 16, 2010 and March 13, 2012, AgFeed paid Minds Islands, a company controlled by Gothner's wife, $111,000 for web hosting services. The complaint alleges that the relationship between AgFeed and Minds Island served no useful purpose and provided no value to AgFeed.

The complaint further alleges that between October and December 2010, Walston DuPont Global Advisors paid Gothner, Gothner's family and Minds Island $150,000 (collectively, the "Walston DuPont Transfers"): (i) On October 6, 2010, Walston DuPont transferred $50,000 to a personal checking account controlled by

Gothner and his wife; (ii) On October 8, 2010, Walston DuPont

transferred $50,000 to a university campus checking account controlled

by Gothner's step-daughter; and (iii) On December 3, 2010, Walston

DuPont transferred $50,000 to Minds Island.  The complaint contends

that Gothner failed to disclose, or to fully disclose to AgFeed and the

Board, his personal relationship to the recipients of these Transfers.

<u>The Bankruptcy Filing</u>

On July 15, 2013, the Debtors filed for Chapter 11 relief in this

Court.  On August 29, 2013, the Debtors filed a motion to reject

Gothner's employment agreement.  (Dkt. 260).  The Court entered an

order approving that motion on October 15, 2013.  (Dkt. 477).

On November 11, 2013, Gothner submitted a proof of claim,

seeking an amount not less than $1.3 million as an administrative claim

for (i) severance; (ii) unpaid bonus; (iii) inadequate notice of

termination; (iv) accrued vacation time; (v) expense reimbursement;

and (vi) value of unvested stock options.  (Claim No. 278).  The Debtors

have timely filed an objection to Gothner's claim.

On February 23, 2015, the Trustee commenced this adversary

proceeding.  On August 11, 2015, Gothner filed the instant Motion to

dismiss the complaint in its entirety for failure to state a claim pursuant

to FRCP 12(b)(6).  The Court has heard oral argument and the matter
has been fully briefed and is ripe for decision.

### III.  STANDARD OF REVIEW

To decide a motion to dismiss under Rule 12(b)(6), the Court
must "accept all well-pleaded allegations in the complaint as true, and
view them in the light most favorable to the plaintiff."  Carino v. Stefan,
376 F.3d 156, 159 (3d Cir. 2004); see also Phillips v. County of
Allegheny, 515 F.3d 224, 231 (3d Cir. 2008) (stating that the Supreme
Court has reaffirmed that, on a Rule 12(b)(6) motion, the facts alleged
must be taken as true and a complaint may not be dismissed merely
because it appears unlikely that the plaintiff can prove those facts or
will ultimately prevail on the merits").  In addition, all reasonable
inferences are drawn in favor of the plaintiff.  Kost v. Kozakiewicz, 1
F.3d 176, 183 (3d Cir. 1993).  Legal conclusions, however, are not
entitled to a presumption of truth.  Ashcroft v. Iqbal, 556 U.S. 662, 129
S.Ct. 1937, 1946, 173 L.Ed.2d 868 (2009).  Federal Rule of Civil
Procedure 8(a)(2) "requires a 'showing' rather than a blanket assertion
of an entitlement to relief ... [because] without some factual allegation
in the complaint, a claimant cannot satisfy the requirement that he or
she provide not only 'fair notice,' but also the 'grounds' on which the

claim rests." <u>Phillips</u>, 515 F.3d at 232 (citing <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 556 at n. 3, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)).

The Trustee has alleged actual fraud in several Counts, which must meet the elevated pleading standard of Federal Rule of Civil Procedure 9(b). Rule 9(b), made applicable here by Federal Rule of Bankruptcy Procedure 7009, states:

> In alleging fraud or mistake, a party *must state with particularity the circumstances constituting fraud* or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally.

Fed. R. Civ. P. 9(b) (emphasis added). The Third Circuit has explained that the purpose of Rule 9(b)'s requirement that plaintiffs particularly plead the "circumstances" of the alleged fraud is to "place the defendants on notice of the precise misconduct with which they are charged, and to safeguard defendants against spurious charges of immoral and fraudulent behavior." <u>Seville Indus. Machinery Corp. v. Southmost Machinery Corp.</u>, 742 F.2d 786, 791 (3d Cir. 1984), cert. denied, 469 U.S. 1211, 105 S.Ct. 1179, 84 L.Ed.2d 327 (1985). It is not a defendant's fraudulent intent that must be pled with particularity, but the circumstances constituting fraud. The Third Circuit has indicated that, "allegations of 'date, place or time' fulfill these functions, but nothing in the rule requires them. Plaintiffs are free to use alternative

means of injecting precision and some measure of substantiation into their allegation of fraud." <u>Seville Indus.</u>, 742 F.2d at 791.

This Court has additionally held that "[t]he requirements of Rule 9(b) are relaxed and interpreted liberally where a trustee or a trust formed for the benefit of creditors . . . is asserting the fraudulent transfer claims." <u>Official Comm. of Unsecured Creditors of Fedders North America, Inc. v. Goldman Sachs Credit Partners (In re Fedders North America, Inc.)</u>, 405 B.R. 527, 544 (Bankr. D. Del. 2009). This is because a trustee "inevitabl[y] lack[s] knowledge concerning acts of fraud previously committed against the debtor, a third party." <u>Id.</u> (quoting <u>Schwartz v. Kursman (In re Harry Levin, Inc. t/a Levin's Furniture)</u>, 175 B.R. 560, 567–68 (Bankr. E.D. Pa. 1994)). As outsiders to the transactions in question, the Trustee may be put to some trouble to develop its case, but the pleading requirements under Rules 8, 9, and 12(b)(6) remain applicable.

## IV.  DISCUSSION

All parties have agreed that (i) Nevada state law[2] governs Counts I, II, III, IV and V; (ii) Massachusetts state law governs Counts

---

[2] Nevada's corporate law is modeled largely after Delaware's corporate law. <u>See</u> <u>Cohen v. Mirage Resort, Inc.</u>, 62 P.3d 720, 726-27 & n. 10 (Nev. 2003). As such, when there is no Nevada law on a particular point, Nevada courts look to decisions of Delaware courts, or decisions applying Delaware law, for guidance. <u>Hilton Hotels Corp. v. ITT Corp.</u>, 978 F.

VI and VII; and (iii) Delaware federal law governs Counts VIII, IX, X, XI and XIII.  The Court will address each count in turn.

### (I) Breach of Fiduciary Duty (Duty of Care)

The first cause of action alleges that Gothner breached his fiduciary duty of care by failing to properly supervise and monitor the adequacy of AgFeed's internal controls and by allowing AgFeed to issue and disseminate misleading statements and filings.  See Complaint at ¶ 99.

Under Nevada law, a corporation's "board of directors has full control over the affairs of the corporation."  See, e.g., Shoen v. SAC Holding Corp., 122 Nev. 621, 632, 137 P.3d 1171, 1178 (2006) (citing NRS 78.120(1)); Berman v. Riverside Casino Corporation, 247 F.Supp. 243, 245 (D. Nev. 1964).   The board's power to act on the corporation's behalf is governed by the directors' fiduciary relationship with the corporation and its shareholders, which imparts upon the directors duties of care and loyalty.  Shoen, 122 Nev. at 632 (citations omitted).  In essence, the duty of care consists of an obligation to act on an informed basis.  Id.

---

Supp. 1342, 146 (D. Nev. 1997); Hamilton P'rs, L.P. v. Highland Cap. Mgmt., L.P., 2014 WL 1813340, at *18 & n. 158.  Thus, the Court will do the same.

However, balancing these duties is the protection generally afforded directors in conducting the corporation's affairs by the business judgment rule. See id. The Nevada legislature has codified the business judgment rule. See id. at 1179 (citing Nev.Rev.Stat. § 78.138 ("Directors and officers shall exercise their powers in good faith and with a view to the interests of the corporation.")). The business judgment rule defines the line between ordinary negligence—which is insulated from liability—and actionable gross negligence. See F.D.I.C. v. Jacobs, No. 3:13-CV-00084-RCJ, 2014 WL 5822873, at *4 (D. Nev. Nov. 10, 2014) (citing Shoen, at 1184 ("With regard to the duty of care, the business judgment rule does not protect the gross negligence of uninformed directors and officers.")), reconsideration denied, No. 3:13-CV-00084-RCJ, 2014 WL 7176756 (D. Nev. Dec. 16, 2014). Case law provides the following definition of gross negligence under Nevada law:

> Gross negligence is substantially and appreciably higher in magnitude and more culpable than ordinary negligence. Gross negligence is equivalent to the failure to exercise even a slight degree of care. It is materially more want of care than constitutes simple inadvertence. It is an act or omission respecting legal duty of an aggravated character as distinguished from a mere failure to exercise ordinary care. It is very great negligence, or the absence of slight diligence, or the want of even scant care. It amounts to indifference to present legal duty, and to utter forgetfulness of legal obligations so far as other persons may be affected. It is a heedless and palpable violation of legal

duty respecting the rights of others.  The element of culpability
which characterizes all negligence is, in gross negligence,
magnified to a higher degree as compared with that present in
ordinary negligence.  Gross negligence is manifestly a smaller
amount of watchfulness and circumspection than the
circumstances require of a prudent man.  But it falls short of
being such reckless disregard of probable consequences as is
equivalent to a willful and intentional wrong.  Ordinary and
gross negligence differ in degree of inattention, while both differ
in kind from willful and intentional conduct which is or ought to
be known to have a tendency to injure.

F.D.I.C. v. Johnson, No. 2:12-CV-209-KJD-PAL, 2014 WL 5324057, at *3

(D. Nev. Oct. 17, 2014) (citing Hart v. Kline, 61 Nev. 96, 116 P.2d 672,

274 (Nev. 1941)).

Here, the complaint alleges that "AgFeed's U.S.-based board

members were made aware of significant accounting issues in China in

the months prior to Gothner's joining the board."  See Complaint at ¶

28.  The complaint further alleges that "Gothner inherited the

institutional knowledge held by the audit committee and the Board

adviser Ritterreiser about the serious accounting issues that had

surfaced in China in 2009" and despite this knowledge, Gothner

oversaw and approved the filing of numerous improperly audited and

faulty financial statements.  See Complaint at ¶ 33-52.

These allegations are insufficient to overcome the business

judgment rule.  The complaint fails to allege particularized facts

showing that Gothner's acts or omissions constituted gross negligence.

At best, the complaint alleges that Gothner should have known that fraud was taking place or that Gothner should have done more to realize that fraud was occurring. See Complaint at ¶33 ("Gothner inherited the institutional knowledge held by the audit committee and the Board adviser Rittereiser about the serious accounting issues that had surfaced in China in 2009 and remained to be resolved."); Complaint at ¶101 ("As a member of the AgFeed Board, Gothner was directly responsible for authorizing, permitting the authorization of, or failing to monitor the practices that resulted in violations of applicable laws alleged herein.").

However, as discussed above, overcoming the business judgment rules requires the articulation of facts that suggest a wide disparity between the processes the director used and that which would have been rational. In other words, the complaint must allege facts establishing a decision that is so unreasonable that it seems essentially inexplicable on any ground other than bad faith. Here, the complaint falls well short of that requirement. The complaint does not identify any decisions Gothner actually made relating to the disclosures or the quality of his decision making process. The complaint does not address how any of Gothner's actions, or failure to act, were grossly negligent. Instead, the complaint reflects that Gothner joined in 2009 —

after the fraudulent conduct occurred—and actively led and

participated in an investigation into that fraud.  Necessary disclosures

were made as that investigation progressed.  At most, the complaint

expressed a wish that the investigation had proceeded more quickly.

That does not support a finding that Gothner was grossly negligent.

Taking the allegations of the complaint as true, the Court concludes

therefore that the complaint does not allege sufficient facts to overcome

the protections of the business judgment rule.  The first cause of action

thus fails to state a claim for breach of the duty of care.

### (II) Breach of Fiduciary Duty (Duty of Loyalty)

Count II alleges that Gothner breached his fiduciary duty of

loyalty by causing AgFeed "to enter into transactions with and incur

obligations to parties that benefited Gothner but did not benefit the

Company" and by engaging in "self-dealing."  See Complaint at ¶ 104-

07.

As discussed above, a board's power to act on the corporation's

behalf is governed by the directors' fiduciary relationship with the

corporation and its shareholders, which imparts upon the directors

duties of care and loyalty.  Shoen, 122 Nev. at 632 (citations omitted).

The duty of loyalty requires the board and its directors to maintain, in

good faith, the corporation's and its shareholders' best interests over

anyone else's interests. Id., 122 Nev. at 632.  To state a legally sufficient

claim for breach of the duty of loyalty, plaintiffs must allege facts

showing that a self-interested transaction occurred, and that the

transaction was unfair to the company.  Fedders, 405 B.R. at 540

(discussing breach of the duty of loyalty under Delaware law).

However, under Nevada law, directors and officers may only be found

personally liable for breaching their fiduciary duty of loyalty *if that*

*breach involves intentional misconduct, fraud, or a knowing violation of the*

*law.* See Shoen, 122 Nev. at 640 (emphasis added).

    The complaint alleges two categories of self-dealing transactions

(i) payments made by or on behalf of AgFeed to Minds Island, a

company allegedly controlled by Gothner's wife and (ii) payments

made by Walston DuPont to members of Gothner's family.  See

Complaint at ¶¶ 69-73, 105.

        *(i) Minds Island Payments*

    Regarding the transactions with Minds Island, the complaint

alleges that

> [b]etween April 16, 2010 and March 13, 2012, the Company paid
> no less than $111,000 to a checking account owned by Minds
> Island, a company controlled by Gothner's wife, Betsy. The
> ostensible purpose of these payments was for certain services
> rendered by Minds Island or a related company to the Company
> for web hosting services.  In fact, the relationship between the

22

> Company and Minds Island served no useful purpose to the
> Company and provided no value to the Company.

Complaint at ¶ 69.  Taking the allegations of the complaint as true, the

Court concludes that the second cause of action fails to state a claim for

breach of the duty of loyalty because the complaint falls well short of

alleging intentional misconduct, fraud, or a knowing violation of the

law.

The complaint fails to allege facts regarding who approved the

payments to Minds Island, on what terms or process the payments

were approved, or that Gothner had any role in AgFeed's decision to

retain Minds Island to provide web design services.  The complaint also

fails to allege that Gothner stood on both sides of the transaction.  The

conclusory statement that Gothner's wife "controlled" Minds Island is

insufficient to show that Gothner stood on both sides of the transaction.

See Zoren v. Genesis Energy, L.P., 836 A.2d 521, 528 (Del. Ch. 2003)

(dismissing a self-dealing claim making only conclusory allegations

that defendants were interested in the transaction); In re Sea-Land

Corp. S'holders Litig., 1987 WL, at **4-5 (Del. Ch. May 22, 1987)

(holding that conclusory allegations were insufficient to plead control).

As a result, the Court concludes that the complaint fails to allege

sufficient facts regarding the payments to Minds Island to support a cause of action for breach of the duty of loyalty.

*(ii) Payments Made by Walston DuPont*

Regarding the transactions with Walston DuPont, the complaint alleges that "Gothner and his family received no less than $150,000 in compensation between October and December of 2010 from Walston DuPont Global Advisors[], ostensibly a financial adviser to the Company." Again, taking the allegations of the complaint as true, the Court concludes that the second cause of action fails to state a claim for breach of the duty of loyalty because the complaint falls well short of alleging intentional misconduct, fraud, or a knowing violation of the law.

The complaint fails to allege that either AgFeed or Gothner, in his capacity as a fiduciary to AgFeed, were involved in the transaction. The complaint fails to allege facts regarding who approved the transfers, on what terms or process the transfers were approved, or that Gothner or AgFeed had any role in Walton DuPont's decision to make these transfers. Most significantly, the complaint fails to allege that Gothner (or AgFeed) stood on both sides of the transaction.

As a result, the Court concludes that the second cause of action fails to state a claim for breach of the duty of loyalty regarding both the Minds Island transactions and the Walston DuPont transactions.

(III) Gross Mismanagement

The third cause of action alleges that Gothner grossly mismanaged AgFeed.  See Complaint at ¶111.  However, Nevada law does not recognize a cause of action for gross mismanagement.  See, e.g., In re Las Vegas Sands Corp. Derivative Litigation, Nos. A576669, A580258, A582074, 2009 WL 6038660, at *9 (Nev. Dist. Ct. Nov. 4, 2009) ("This Court notes that there is no cause of action under Nevada law for gross mismanagement."); Srebnick v. Dean, No. 05-cv-01086-WYD-MJW, 2006 WL 2790408, at *6 (D. Colo. Sept. 26, 2006) (dismissing claims of abuse of control and gross mismanagement for failure to state a claim because they are not recognized under Nevada law).  As a result, the Court concludes that the third cause of action fails to state a claim upon which relief may be granted.

(IV) Abuse of Control

The fourth cause of action alleges that Gothner's conduct constituted an abuse of control over AgFeed.  See Complaint at ¶113. However, Nevada law does not recognize a cause of action for abuse of control.  See, e.g., In re Amerco Derivative Litig., 127 Nev. Adv. Op. 17,

25

252 P.3d 681, 700 n.11 (2011) ("Nevada does not recognize a cause of action for abuse of control"); Srebnick, 2006 WL 2790408 at *6 (dismissing claims of abuse of control and gross mismanagement for failure to state a claim because they are not recognized under Nevada law).  As a result, the Court concludes that the fourth cause of action fails to state a claim upon which relief may be granted.

(V) Waste of Corporate Assets

The fifth cause of action alleges that Gothner's conduct constituted a waste of corporate assets.  See Complaint at ¶119.  Parties have not cited any Nevada decisional law recognizing or defining waste of corporate assets.[3]  As a result the Court will turn to Delaware law for guidance.

"The pleading burden on a plaintiff attacking a corporate transaction as wasteful is necessarily higher than that of a plaintiff challenging a transaction as 'unfair' as a result of the directors' conflicted loyalties or lack of due care."  Harbor Fin. Partners v. Huizenga, 751 A.2d 879, 892 (Del. Ch. 1999) (citing In re 3COM Corp. S'holders Litig., C.A. No. 16721, 1999 WL 1009210, at *11 (Del. Ch. Oct.

---

[3] The Court notes that through its independent research, the Court found only two Nevada state cases that even mention waste of corporate assets, and neither of those cases provides a definition. See Valley Bank of Nevada v. Ginsburg, 110 Nev. 440, 874 P.2d 729 (1994); Clark Cty. Sports Enterprises, Inc. v. Kaighn, 93 Nev. 395, 566 P.2d 411 (1977).

25, 1999)).  To plead a claim of waste, the plaintiff must allege facts

showing that "no person of ordinary sound business judgment" could

view the benefits received in the transaction as "a fair exchange" for the

consideration paid by the corporation.  <u>Michelson v. Duncan</u>, 407 A.2d

211, 224 (Del. 1979) (internal quotations omitted).

    The complaint does not specify which transactions constitute a

waste of AgFeed's assets.  Assuming the complaint is alleging that the

transactions with Minds Island and Walton DuPont constituted waste,

the cause of action for waste fails for the same reasons that the cause of

action for self-dealing failed.  The complaint describes these

transactions in bare and conclusory fashion.

    The complaint fails to allege who approved the transactions with

Minds Island, whether AgFeed entered in to a contract with Minds

Islands, what the terms of the transaction were, who approved the

transactions, or how the terms of the transaction constituted waste.

Further, the transactions regarding Walston DuPont are not alleged to

have been made, either directly or indirectly, from AFI funds, and thus

fail.  The complaint fails to allege facts regarding who approved the

transfers, on what terms or process the transfers were approved, or that

Gothner or AgFeed had any role in Walton DuPont's decision to make

these transfers.  Taking all allegations of the complaint as true, the

Court concludes that the complaint has not alleged sufficient facts to support an allegation that "no person of ordinary sound business judgment" could view the benefits received in the transaction as "a fair exchange" for the consideration paid by the corporation.

Accordingly, the Court concludes that the fifth cause of action fails to state a claim for waste.

### (VI) Unjust Enrichment

Count VI alleges that "it would be unjust for Gothner to retain any amounts he received from [AgFeed] or anyone employed by, or acting on behalf of [AgFeed]."

Massachusetts law, which governs claims relating to Gothner's Employment Agreement, does not allow litigants to override an express contract by arguing unjust enrichment. See, e.g., Platten v. HG Bermuda Exempted Ltd., 437 F.3d 118, 130 (1st Cir. 2006) (citing Zarum v. Brass Mill Materials Corp., 334 Mass. 81, 134 N.E.2d 141, 143 (1956) ("The law will not imply a contract where there is an existing express contract covering the same subject matter.")).

The Trustee argues that courts in Massachusetts commonly allow plaintiffs to pursue breach of contract claims in the alternative to unjust enrichment claims. The case law that the Trustee relies upon is

readily distinguishable from the case at bar.[4]  In those cases, courts have allowed a plaintiff to pursue a claim for unjust enrichment where the contract, covering the same subject matter, was found to be unenforceable or invalid.  Here, there have been no allegations that the Employment Agreement is unenforceable or invalid.  Rather, the Trustee alleges that it would be "unjust for Gothner to retain any amounts he received" as "compensation for his various roles with the AgFeed Board and as an officer of AgFeed."

The Employment Agreement directly governs Gothner's compensation and employment with AgFeed.  As a matter of Massachusetts law, the Trustee is prevented from bringing an unjust enrichment claim covering the same subject matter as the Employment Agreement.  Accordingly, the Court concludes that the sixth cause of action fails to state a claim for unjust enrichment.

---

[4] See DFR Apparel Co. v. Triple Seven Promotional Prods., 2014 U.S. Dist. LEXIS 141069 * 8 (D. Nev. Sept. 30, 2014) ("a plaintiff may not recover under both theories with regards to the same transaction, at this stage [plaintiff] is free to seek both equitable remedies of breach of contract in the alternative.  Should the parties' contract be found unenforceable or invalid, [plaintiff] may assert an unjust enrichment or quantum meruit claim."); WMCV Phase 3, LLC v. Shushok & McCoy, Inc., 2:10-CV-00661-GMN, 2013 U.S. Dist. LEXIS 181076, 2013 WL 6858788 (D. Nev. Dec. 27, 2013), appeal dismissed (May 12, 2014) (holding that where a plaintiff claimed breach of contract and unjust enrichment in the alternative, and the court later found the contract unenforceable, the plaintiff was free to pursue unjust enrichment despite that it had sued for breach of the contract).

<u>(VII) Breach of Contract (in the Alternative to Count VI)</u>

Count VII alleges that Gothner breached the Employment Agreement by "failing to uphold his duty of loyalty to act in the best interests of the Company under section 5(a) of the contract," by "failing to uphold his fiduciary duties under section 5(b) of the contract," and by "failing to uphold his legal obligation to disclose under section 5(d) of the contract."

To state a claim for breach of contract under Massachusetts law, a plaintiff must allege, at a minimum, that there was a valid contract, that the defendant breached its duties under the contractual agreement, and that the breach caused the plaintiff damage. <u>See</u>, <u>e.g.</u>, <u>Stagikas v. Saxon Mortgage Servs., Inc.</u>, 795 F. Supp. 2d 129, 136 (D. Mass. 2011).

The Trustee fails to plead a material element of its claim for breach of contract—that Gothner breached the Employment Agreement—because, as a matter of law, section 5(a), 5(b) and 5(d) of the Employment Agreement do not impose any affirmative duties on Gothner.  Section 5 of the Employment Agreement provides:

> 5(a). Fiduciary Duty.  [Gothner] *acknowledges and agrees* that, as an employee of the Company, [Gothner] has a duty of loyalty to act in the best interests of [AFI].

> 5(b). Receipt as Fiduciary.  All Confidential information . . . that

[Gothner] obtains in the course of performing [Gothner's] duties and responsibilities under this Agreement *shall be deemed to have been received by [Gothner] as a fiduciary* of [AFI].

5(d). Legal Obligation to Disclose. [Gothner] *may disclose Confidential Information* at such times, in such manner and to the extent such disclosure is required by applicable law, provided [Gothner] (i) provides [AFI] with prior written notice of such disclosure so as to permit [AFI] to seek a protective order or other appropriate remedy, (ii) limits such disclosure to what is strictly required and (iii) attempts to preserve the confidentiality of any such Confidential Information so disclosed.

See Complaint at ¶88 (emphasis added).  As discussed in detail below, even if an affirmative duty is imposed under these sections, the Court concludes that the Trustee has failed to allege facts sufficient to support a claim for breach of contract.

Section 5(a) of the Employment Agreement does not impose an affirmative duty upon Gothner.  Instead, it "acknowledges and agrees" that Gothner "has a duty of loyalty to act in the best interests of" AFI. Because Section 5(a) does not impose an affirmative duty, Count VII fails to state a claim for breach of contract under Section 5(a) of the Employment Agreement.  Even assuming that Section 5(a) of the Employment Agreement did impose an affirmative duty of loyalty to act in the best interests of AFI, for the reasons discussed in regard to the second and third causes of action, the complaint fails to allege facts sufficient to support a claim that Gothner has breached any fiduciary

duty.  As a result, the Court concludes that the seventh cause of action fails to state a claim for breach of contract under Section 5(a) of the Employment Agreement.

Section 5(b) of the Employment Agreement does not impose an affirmative duty upon Gothner.  Rather, it simply states that "all confidential information" obtained "shall be deemed to have been received by" Gothner in his fiduciary capacity.  Because Section 5(b) does not impose an affirmative duty, Count VII fails to state a claim for breach of contract under Section 5(b) of the Employment Agreement. Even assuming that Section 5(b) of the Employment Agreement did impose an affirmative duty, the complaint does not allege that Gothner received any "Confidential Information" or disclosed any "Confidential Information."  Thus, the complaint would still fail to state a claim for breach of contract under Section 5(b) of the Employment Agreement.

Section 5(d) of the Employment Agreement does not impose an affirmative duty upon Gothner, but instead permits disclosure of Confidential Information when a legal duty to disclose arises.  Because Section 5(d) does not impose an affirmative duty, Count VII fails to state a claim for breach of contract under Section 5(d) of the Employment Agreement.  Even assuming that Section 5(d) of the Employment Agreement did impose an affirmative duty, the complaint

does not allege that Gothner received any "Confidential Information"

or disclosed any "Confidential Information."  Thus, the complaint

would still fail to state a claim for breach of contract under Section 5(d)

of the Employment Agreement.

For these reasons, the Court concludes that the seventh cause of

action fails to state a claim for breach of contract.

(VIII), (IX) and (X) – Fraudulent Transfers

Count VIII alleges that payments made to Gothner under the

Employment Agreement are avoidable fraudulent transfers under 11

U.S.C. § 548(a)(1)(B).  Count IX alleges that the Minds Islands

Payments, which are discussed in more detail below, are avoidable

fraudulent transfers under 11 U.S.C. § 548(a)(1)(A) and (B).  Count X

alleges that payments made to Minds Island, Gothner's wife and

stepdaughter are avoidable fraudulent transfers pursuant to 11 U.S.C. §

544 and "the laws of Nevada, Delaware, Tennessee, and

Massachusetts."  See Complaint at ¶ 148, Exhibit B.

*Applicable Law*

Section 548 allows recovery of fraudulent transfers made within

two years before the Petition Date.  11 U.S.C. § 548(a)(1)(A).  Under §

548(a)(1)(A), a debtor can recover for transfers made "with actual intent

to hinder, delay, or defraud" present or future creditors of the debtor.

Id. Because direct evidence of fraudulent intent is often unavailable, courts usually rely on circumstantial evidence to infer fraudulent intent. Fedders, 405 B.R. at 545(citations omitted). In doing so, courts look to common law and statutory badges of fraud. Id. (analyzing federal common law badges).

The "badges of fraud" that courts often refer to include, but are not limited to: (1) the relationship between the debtor and the transferee; (2) consideration for the conveyance; (3) insolvency or indebtedness of the debtors; (4) how much of the debtor's estate was transferred; (5) reservation of benefits, control or dominion by the debtor over the property transferred; and (6) secrecy or concealment of the transaction. In re Hechinger Inv. Co. of Del., 327 B.R. 537, 551 (D. Del. 2005), aff'd sub nom., 278 F. App'x 125 (3d Cir. 2008). The presence or absence of any single badge of fraud is not conclusive. In re Hill, 342 B.R. at 198. "The proper inquiry is whether the badges of fraud are present, not whether some factors are absent. Although the presence of a single factor, i.e. badge of fraud, may cast suspicion on the transferor's intent, the confluence of several in one transaction generally provides conclusive evidence of an actual intent to defraud." Id. A court may also consider other factors relevant to the transaction. Id. at 198–99.

Section 548(a)(1)(B) governs constructively fraudulently transactions and provides that a debtor can recover a transfer if the debtor received less than reasonably equivalent value *and* was (i) insolvent at the time of the transfer, (ii) was left with unreasonably small capital, or (iii) intended or believed it would incur debt beyond its ability to repay as the debts matured. 11 U.S.C. § 548(a)(1)(B).

Under section 544(b) of the Code, a trustee in bankruptcy may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable state law by a creditor holding an allowable, unsecured claim. 11 U.S.C. § 544(b). The Trustee invokes this remedy, but fails to identify a specific state law or statute that would allow it to avoid the transfers. Rather, the Trustee seeks to avoid the "[t]ransfers as fraudulent under one or more of Nev. Rev. Stat. Ann. §§ 112.140 to 112.250 (Nevada); Tenn. Code Ann. §§ 66-3-301 to 66-3-315 (Tennessee); 6 Del. C. §§ 1301 to 1311 (Delaware); I.C.A. §§ 684.1 to 684.12 (Iowa); and/or ALM GL ch. 109A, §§ 1 to 12 (Massachusetts)." See Complaint at ¶ 153. Each statute utilizes the same language, and each largely mirror the language of sections 548(a)(1)(A) and (B) of the Code.

*Pleading Requirements*

As discussed in detail above, a party asserting a claim for actual fraud must allege sufficient facts to satisfy the heightened requirement of FRCP 9(b).   The Plaintiff must go beyond merely parroting statutory language.  See Global Link Liquidating Trust v. Avantel, S.A. (In re Global Link Telecom Corp.), 327 B.R. 711, 718 (Bankr. D. Del. 2005).

A claim of constructive fraud, however, "need not allege the common variety of deceit, misrepresentation, or fraud in the inducement . . . because the transaction is presumptively fraudulent and all that need be alleged is that the conveyance was made without fair consideration while the debtor was functionally insolvent." Id. at 718.  Nonetheless, the Trustee must do more than simply allege the statutory elements of a constructive fraud action.  Id. at 718.

*(VIII) Fraudulent Transfers – Employment Agreement*

Count VIII alleges that any payments made to Gothner under the Employment Agreement were made within two years before the petition date, were made to or for the Defendant's benefit, and to the extent any of the transfers were not made on account of antecedent debt owed by the Debtor, the Debtor did not receive reasonably equivalent value in exchange for the transfers.  See Complaint at ¶¶

133-36. Additionally, the complaint alleges that on the date each transfer was made, the Debtor: (a) "[w]as insolvent or became insolvent as a result of such transfer;" (b) "was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the Debtor was an unreasonably small capital;" or "(c) intended to incur, or believed it would incur, debts that would be beyond the Debtor's ability to pay as such debts matured." See Complaint at ¶138.

Taking all facts in the complaint as true and drawing all reasonable inferences in favor of Plaintiff, the Court holds that Plaintiff has failed to state a claim against the Defendant under section 548(a)(1)(B). The complaint fails to allege specific facts relating to the date of any of the transfers, the amount of any of the transfers or the transferor of any of the transfers. Rather, the complaint makes a general reference to all "payments made to Gothner under the Employment Agreement." See Complaint at ¶133. This language is insufficient to survive a 12(b)(6) motion. See Pardo v. Found. Health Corp. (In re APF Co.), 2004 WL 1969580, at *1 (Bankr. D. Del. Jan. 21, 2004) (dismissing 548 claims where the complaint merely alleged that the debtors "made a number of payments" relative to particular note obligations). Furthermore, the allegations in the complaint simply

mirror the language of section 548(a)(1)(B). This too is insufficient. <u>See</u> <u>Global Link</u>, 327 B.R. at 718.

For these reasons, the Court concludes that the eighth cause of action fails to state a claim for an avoidable fraudulent transfer under 11 U.S.C. § 548(a)(1)(B).

*(IX) Fraudulent Transfers (§ 548) – Minds Island Payments*

The complaint alleges that "Gothner caused or oversaw the transfer of more than $32,000 from AgFeed and related entities or by entities with a business relationship to AgFeed to entities controlled either by Gothner, his wife or in which he otherwise had an interest, or to immediate[] family members." Complaint at ¶ 140. Additionally, the complaint alleges that each transfer was made or incurred with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted." Complaint at ¶143. The complaint also alleges that on the date each transfer was made, the Debtor: (a) "[w]as insolvent or became insolvent as a result of such transfer;" (b) "was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the Debtor was an unreasonably small capital;" or "(c) intended to incur, or

believed it would incur, debts that would be beyond the Debtor's ability to pay as such debts matured." <u>See</u> Complaint at ¶144.

(i) Section 548(a)(1)(A) – Actual Fraud

Taking all facts in the complaint as true and drawing all reasonable inferences in favor of Plaintiff, the Court concludes that Plaintiff has failed to state a claim for actual fraud under section 548(a)(1)(A).

The complaint does not articulate which entity made any of the alleged transfers. Rather, the complaint alleges that the transfers were made by "[AFI] and related entities or by entities with a business relationship to [AFI]." Thus, according to the complaint either (i) AFI, (ii) a related entity, or (iii) an entity with a business relationship to AFI was the transferor. This falls well short of the particularity requirements of FRCP 9(b).

Further, the complaint does not sufficiently allege facts regarding the circumstances constituting fraud. The complaint merely mirrors the language of the statute, alleging that each "transfer was made or incurred with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted." <u>See</u>

Complaint at ¶ 143. This type of conclusory language that simply mirrors the statute is insufficient. See Global Link, 327 B.R. at 718.

For these reasons, the Court concludes that the ninth cause of action has failed to state a claim against the Defendant for actual fraud under section 548(a)(1)(A).

(ii) Section 548(a)(1)(B) - Constructive Fraud

The Court concludes that the Trustee has alleged sufficient facts to support a claim for constructive fraud under section 548(a)(1)(B). As discussed above, to support a claim of constructive fraud "all that need be alleged is that the conveyance was made without fair consideration while the debtor was functionally insolvent." Here, the complaint identifies the date, amounts, source and transferee of each of the transfers. See Complaint at ¶140, Exhibit A. At this stage of the proceedings, the Court concludes that the facts alleged by the Trustee are sufficient to support a claim for constructive fraud under section 548(a)(1)(B).

(X) Fraudulent Transfers (Applicable State Law and § 544)

The complaint alleges that "Gothner caused or oversaw the transfer of at least $261,000 from AgFeed or entities or individuals with a business relationship to AgFeed to Gothner and his wife and stepdaughter or to Minds Island." See Complaint at ¶ 147.

The Trustee is seeking to avoid a total of 17 transfers, 14 of which are alleged to have been made by "AgFeed Industries or Affiliate" (the "AgFeed Transfers") and 3 are alleged to have been made by "Walston DuPont Advisors" (the "Walston DuPont Transfers").  See Complaint at Exhibit B.  The complaint alleges that all of the AgFeed Transfers were made to Minds Island.  Id.  The complaint alleges that the Walston DuPont Transfers were made to "Gothner Spouse Joint Checking Account" for $50,000, to "Sarah Goolishian (Stepdaughter) Account for $50,000, and to Minds Island for $50,000.  Id.  Table 1 below summaries the alleged transfers:

| TABLE 1 | | | |
|---|---|---|---|
| # of Transfers | Transferee | Source | Amount |
| 14 | Minds Island - Checking Account | AgFeed Industries or Affiliate | $111,000.00 |
| 1 | Gothner/Spouse Joint Checking Account | Walston DuPont Advisors | $50,000.00 |
| 1 | Sarah Goolishian (Stepdaughter) Checking Account | Walston DuPont Advisors | $50,000.00 |
| 1 | Minds Island - Checking Account | Walston DuPont Advisors | $50,000.00 |

See Complaint at Exhibit B.

The elements of a fraudulent conveyance under any of the state laws pled in the complaint are substantially similar to those of a fraudulent conveyance claim under section 548 of the Bankruptcy Code or under the Uniform Fraudulent Transfer Act.  See Complaint at ¶ 148

(alleging that the "operative provisions of each state's fraudulent

transfer statute are materially identical").  Each of these statutes

provide that

> (a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
>> (1) With actual intent to hinder, delay or defraud any creditor of the debtor; or
>> (2) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:
>>> a. Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
>>> b. Intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

See Uniform Fraudulent Transfer Act § 4(a).

*Actual Fraud*

The complaint does not sufficiently allege facts regarding the

circumstances constituting fraud.  The complaint merely mirrors the

language of the statute, alleging that each "transfer was made or

incurred with actual intent to hinder, delay, or defraud any entity to

which the debtor was or became, on or after the date that such transfer

was made or such obligation was incurred, indebted."  See Complaint

at ¶ 152.  This type of conclusory language that simply mirrors the statute is insufficient.  See Global Link, 327 B.R. at 718.

For these reasons, the Court concludes that the tenth cause of action has failed to state a claim for actual fraud under section 544 and the applicable state law.

*Constructive Fraud*

The complaint alleges that on the date each transfer was made, the Debtor failed to receive reasonably equivalent value in exchange for each transfer, and at the time of each transfer, the debtor: (i) "was engaged in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or (ii) intended to incur, or believed or reasonably should have believed it would incur, debts that would be beyond the debtor's ability to pay as such debts became due.  See Complaint at ¶151-53.

As discussed above, to support a claim of constructive fraud "all that need be alleged is that the conveyance was made without fair consideration while the debtor was functionally insolvent."  Here, the complaint identifies the date, amounts, source and transferee of each of the transfers.  See Complaint at ¶140, Exhibit B.  At this stage of the proceedings, the Court concludes that the facts alleged by the Trustee

are sufficient to support a claim for constructive fraud under section 544 and the applicable state law.

  (XI) and (XII) Recovery of Avoidable Transfers (§ 550) and Disallowance of Claims (§ 502(d))

Because the ninth and tenth causes of actions are not being dismissed in their entirety, the eleventh and twelfth causes of action do not fail to state a claim upon which relief may be granted.

### V. CONCLUSION

For the foregoing reasons, the Motion is granted with respect to Counts I, II, III, IV, V, VI, VII and VIII without prejudice.  The Motion is granted in part with respect to Counts IX and X without prejudice.  The Motion is denied with respect to Counts XI and XII.

**BY THE COURT**:

Dated:  February 19, 2016
Wilmington, Delaware

_____
Brendan Linehan Shannon
Chief United States Bankruptcy Judge